J-S73037-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| --- | --- | --- |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ORLANDO STANFORD | : | |
| | : | |
| Appellant | : | No. 789 WDA 2018 |

Appeal from the Judgment of Sentence January 23, 2018
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0003058-2015

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and OLSON, J.

MEMORANDUM BY OLSON, J.:                    FILED DECEMBER 28, 2018

Appellant, Orlando Stanford, appeals from the judgment of sentence entered on January 23, 2018, as made final by the denial of Appellant's post-sentence motion on May 14, 2018.  We affirm.

The trial court thoroughly summarized the facts underling this appeal:

> Trial commenced following jury selection on October 2, 2017. The Commonwealth first presented the testimony of Sergeant [Daniel] Uncapher.  At the time of trial, Sergeant Uncapher was [a 24-year veteran of] the Allegheny Township Police Department. . . .  Sergeant Uncapher worked as a patrolman at the time of the incident in 2014.  He spent the majority of his time working "on the road" rather than at the station. Sergeant Uncapher's duties as a patrolman included accident investigation, general investigation, patrol operations, and answering calls for service.  In addition, he would assist local police departments upon request.  He also assisted other agencies in the past with the service of arrest warrants. Sergeant Uncapher testified that, in addition to receiving the written warrant, he [could] verify the validity of a warrant by contacting Westmoreland County 911.    Westmoreland

County 911 will confirm or deny the warrant by running an NCIC search of the individual's name.

On December 21, 2014, Sergeant Uncapher was dispatched by Westmoreland County 911 to the Sandalwood apartment complex (hereinafter "Sandalwood"). [Westmoreland County 911] received an anonymous tip that [Appellant] was located at Sandalwood and there was an active warrant for his arrest. Sergeant Uncapher was also informed that [Appellant] was potentially armed with a weapon. He confirmed that there was an active warrant for [Appellant's] arrest through Westmoreland County 911. Westmoreland County 911 advised Sergeant Uncapher that there was an active warrant for [Appellant] out of Pennsylvania State Parole. [Sergeant Uncapher] was not aware of [Appellant] prior to this incident. He believed that the apartment was rented by Amber Lovelace, but he did not know this [information] prior to serving the warrant. Sergeant Uncapher requested assistance from Officer Hosack in serving the warrant. At the time of trial, Officer Hosack was no longer employed by the Allegheny Township Police Department.

Sergeant Uncapher testified that he was familiar with Sandalwood as a police officer. He described Sandalwood as a row of five [], two-story apartments with a downstairs living and kitchen area and upstairs bedrooms and a restroom. Upon arrival to Sandalwood, Sergeant Uncapher reported directly to the apartment in which [Appellant] was allegedly present. He observed that the front door of the apartment was open and approximately five [] to ten [] individuals were located throughout the first floor. Sergeant Uncapher announced his presence to the individuals and Lovelace immediately approached the door. He was not familiar with Lovelace prior to serving the warrant. Sergeant Uncapher testified that Lovelace was "very friendly" and she did not object to him being at her home. He asked for permission from Lovelace to enter the home. She confirmed that [Appellant] was in the apartment and was located in the upstairs bedroom. Sergeant Uncapher did not attempt to speak with the other individuals in the apartment because it was "so loud" and there were "so many people there." He maintained that he was not familiar with [Appellant] prior to this incident and he did not receive anything that would allow him to identify [Appellant].

Officer Hosack subsequently approached Sergeant Uncapher and Lovelace from the back door of the apartment.  Sergeant Uncapher and Officer Hosack reported to the upstairs bedroom.  In the bedroom, they observed a male lying on a bed where [Appellant] was reportedly located.  The individual was later identified as [Appellant].  [Appellant] was the only individual located in the bedroom.  Sergeant Uncapher testified that they shouted for [Appellant] and announced their presence, but [Appellant] did not respond.  Sergeant Uncapher assumed [Appellant] was sleeping.  Sergeant Uncapher and Officer Hosack subsequently began handcuffing [Appellant] and he woke up.  Sergeant Uncapher explained who they were to [Appellant] and why they were there.  He testified that [Appellant] was dressed in a tank top and a pair of dark colored jeans that day.

Sergeant Uncapher searched [Appellant] and Officer Hosack maintained control of [Appellant] during the search. Sergeant Uncapher could not recall if [Appellant] was sitting or standing during the search.  He testified, however, that an individual is generally standing when he conducts a search. [Appellant] did not present any problems during the search. Officer Hosack indicated that a weapon was present in [Appellant's] "crotch area" and Officer Hosack retrieved an automatic pistol from this area.  Sergeant Uncapher subsequently "cleared" the firearm.  He testified that "clearing" the firearm consists of emptying the firearm's magazine and unchamber[ing] any rounds.  He did not discover any rounds in the firearm's chamber, but he did recover eight [] rounds in the firearm's magazine.  Sergeant Uncapher described the firearm as a nine-millimeter Taurus PT24/7.  After Sergeant Uncapher cleared the weapon, he returned to his station. He entered the firearm into evidence and placed it into an evidence locker.  The firearm was also submitted to the Crime Lab.  The bullets were eventually destroyed in accordance with the department's policy against retaining ammunition.

Sergeant Uncapher contacted Pennsylvania State Parole and advised them that [Appellant] was in custody. [Appellant] was transported back to the Allegheny Township Police Department and was taken to the processing room and holding cell.  Sergeant Uncapher testified that [Appellant]

- 3 -

requested to speak with him while he was entering charges and evidence. More specifically, [Appellant] was willing to speak with him if it "helps him out." Sergeant Uncapher read [Appellant] his Miranda[1] rights, which are generally read from a departmental form. [Appellant] indicated that he still wished to speak with Sergeant Uncapher. [Appellant] told Sergeant Uncapher that he was aware that he was a felon and was not to possess a firearm. [Appellant] also stated that he was at the apartment on the night prior to the incident and was "hanging out" with Lovelace. At one point, [Appellant] supposedly met a male who was known as "Jay." [Appellant] allegedly purchased marijuana from Jay the night before and Jay possessed the firearm that was subsequently found on [Appellant]. Sergeant Uncapher testified that [Appellant] agreed to hold the weapon for Jay and he fell asleep with it in his pants. Sergeant Uncapher was not aware if Jay was present at the apartment on the date of the incident.

Sergeant Uncapher subsequently prepared a police report of the incident. He did not obtain a written statement from [Appellant] and did not provide a specific reason as to why he did not take a written statement. He did, however, state that [Appellant] did not provide much information to him aside from the name "Jay." Sergeant Uncapher asked questions to the other residents of Sandalwood regarding Jay, but no one could confirm his identity. Additionally, he identified "Cade Kennamuth" as the last registered owner of the firearm found on [Appellant].

The Commonwealth thereafter presented the testimony of Officer Seth Hosack. At the time of trial, Officer Hosack was employed by the New Kensington Police Department as a police officer. He worked as a police officer for [13] years. On the date of the incident, Officer Hosack was employed by the Allegheny Township Police Department as a patrolman. Officer Hosack testified that he received information that a wanted individual was armed at Sandalwood. Officer Hosack and Sergeant Uncapher reported to Sandalwood. Upon their arrival, Sergeant Uncapher traveled to the front and Officer Hosack went to the back of the residence. He testified that

_____

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

the back door of the apartment was open. At one point, Officer Hosack observed Sergeant Uncapher speaking with Lovelace. He testified that Lovelace did not appear to be agitated with their presence and the individuals at the apartment were "very nice." Lovelace ["pointed that [Appellant] was upstairs in the bedroom at the top of the stairs." N.T. Trial, 10/2/17, at 76].

Officer Hosack and Sergeant Uncapher proceeded to the upstairs bedroom of the apartment. Officer Hosack testified that an individual appeared to be sleeping in the bedroom. This individual was later identified as [Appellant]. Officer Hosack holstered his weapon and held his Taser to protect Sergeant Uncapher as he apprehended [Appellant]. Officer Hosack thereafter searched [Appellant] while he was secured in handcuffs and lying on the bed. He could not recall the direction in which [Appellant] was lying. Officer Hosack testified that he reached near [Appellant's] "crotch area" and felt what he believed to be a firearm based on its shape, size, and density. He announced the presence of the weapon while searching [Appellant] and retrieved a [firearm] with "some difficulty." Officer Hosack testified that [Appellant] was wearing multiple layers of clothing and the firearm was found in the front flap of [Appellant's] long underwear. Officer Hosack gave Sergeant Uncapher the weapon while he secured [Appellant]. Sergeant Uncapher "cleared" the weapon. They subsequently proceeded to the police station. Sergeant Uncapher filed [Appellant's] charges. Officer Hosack was not present for any statements made by [Appellant] at the police station and he did not participate in the investigation of [Appellant's] case. He was also not aware of any fingerprint evidence that may have been recovered from the firearm.

Sergeant Uncapher was thereafter called again by the Commonwealth to testify. The Commonwealth requested the opportunity to briefly question Sergeant Uncapher in response to questions asked by Defense Counsel regarding fingerprint or DNA evidence on the firearm. Sergeant Uncapher was familiar with the availability of fingerprint and DNA testing at the State Police Crime Lab in Greensburg. He testified that these tests may be costly depending on the number of tests that are required. Sergeant Uncapher does not generally consider this in determining whether to submit

items for fingerprint or DNA testing, unless there is a subsequent AFIS hit on a ballistics cartridge. He testified that it is not common to submit items that are found on a person's body for [fingerprint] or DNA testing. Sergeant Uncapher was not aware of the exact number that it would have cost to perform testing in the instant case. He estimated, however, that the cost to perform testing could have been "in the thousands." Sergeant Uncapher testified that, to his knowledge, the firearm that was found on [Appellant] was never tested for fingerprints.

Upon the conclusion of the Commonwealth's case, [Appellant's] counsel moved for a judgment of acquittal with respect to both of [Appellant's] charges. He argued that the case began with an anonymous tip and the testimony of Lovelace and the individual who made the anonymous tip were not presented by the Commonwealth in this case. [Appellant's] counsel maintained that the Commonwealth provided the testimony of the officers only, who indicated that [Appellant] had a firearm. Ultimately, [counsel argued] that the Commonwealth was unable to establish that [Appellant] had the intent to possess, control, or use or carry a firearm. [Appellant's] counsel reiterated that [Appellant] was sleeping in the bed and allegedly had the firearm on his person. He [argued] that insufficient evidence was presented to establish that [Appellant] had the requisite intent for these charges to be submitted to the jury. Furthermore, he restated that the gun was never processed for prints or DNA evidence. [Appellant's] motion was noted for the record and denied.

. . .

[Appellant] additionally testified at trial regarding the incident. On the date prior to [Appellant's] arrest, he [traveled] to Lovelace's apartment at Sandalwood. He identified Lovelace as his friend. [Appellant] stated that he knew Lovelace for about a month and Sergeant Uncapher's statement that he knew her for approximately two (2) weeks was incorrect. [Appellant] testified that there were about four [] to five [] other individuals present at Lovelace's apartment. He was not familiar with all of the individuals. He did recall, however, that one of the individuals was named Zach Ferguson. At the apartment, they were "smoking,

- 6 -

hanging out, laughing, watching videos, [and] movies." At around 1:00 or 2:00 a.m., [Appellant] fell asleep in the upstairs master bedroom of the apartment. He did not recall informing Sergeant Uncapher that he fell asleep at approximately 4:00 a.m. and indicated that his statement was incorrect. [Appellant] testified that there were two (2) bedrooms located in the apartment. Additionally, no one else was present in the bedroom with [Appellant] when he went to sleep; however, several other individuals were still present in the apartment at the time he went to sleep and they were mostly downstairs.

[Appellant] woke up from sleeping while he was being handcuffed. He testified that he heard the officer announce his presence and request [Appellant's] identity. [Appellant] announced his identity to the officer. [Appellant] denied obtaining a firearm from anyone and testified that a firearm was not located on his person at the time he went to sleep. [Appellant] also claimed that he never observed the firearm that he was charged with possessing. He testified that he did not know that he had an active warrant out for his arrest due to missing a parole appointment. [Appellant] was searched while he was being handcuffed. He testified that he was lying on his right shoulder during the search and the officer helped him get out of bed. Additionally, he testified that Sergeant Uncapher's statement as to what he was wearing was incorrect and he was not wearing long underwear or jeans when he woke up. He also stated that he was not wearing gym shorts. Rather, [Appellant] claimed that he was dressed in a white tank top, boxers, and socks at the time he was handcuffed. He testified that he asked to put on his pants and shoes after he was handcuffed and the officers permitted him to do so. He also stated that one of the officers assisted him with putting additional clothing on. Additionally, [Appellant] put on long johns. [Appellant] also testified that he was searched by the officers after he was permitted to put on his additional clothing. He also did not recall seeing anyone else arrested at the apartment.

[Appellant] recall[ed] signing a document entitled "Constitutional Rights" on the date of the incident that was prepared by Sergeant Uncapher. [Appellant] testified that he was located in the Allegheny Township Police Department holding cell while signing the document. The document

- 7 -

informed [Appellant] of his rights and included a statement providing that the officer read [Appellant] his rights and [Appellant] understood what his rights were. Additionally, it provided that [Appellant] was willing to make a statement and answer the questions asked of him. It also stated that [Appellant] did not wish to have a lawyer present. The document further indicated that no promises or threats had been made to induce [Appellant] to make a statement and no pressure or coercion of any kind had been used against him. [Appellant] spoke voluntarily with Sergeant Uncapher after signing the document. [Appellant] testified that Sergeant Uncapher asked him if he was willing to answer a few questions and he agreed. [Appellant] denied initiating the conversation with Sergeant Uncapher and stating that he would like to help himself out if he could. He testified that Sergeant Uncapher did not provide him with the option to have his statement written or recorded.

[Appellant] testified that Sergeant Uncapher's partner was also present during his questioning. [Appellant testified that he] told Sergeant Uncapher that he was at Sandalwood for [one to two] days and he knew Lovelace. [Appellant] also informed Sergeant Uncapher that he thought Lovelace was a "good person" and they did not have a romantic relationship. Additionally, [Appellant] told Sergeant Uncapher that he knew Lovelace for about a month. He testified that he knew he had a warrant issued by probation and parole due to missing a scheduled appointment with his parole officer. He also informed Sergeant Uncapher that he had a few discrepancies with probation and parole regarding working and missing appointments. [Appellant] was aware that he was not allowed to possess any firearms. [Appellant] did not question Sergeant Uncapher when he was asked if he knew he was not allowed to possess a firearm. Instead, [Appellant] stated that he was not "worried about it" because he did not have anything to do with the firearm. [Appellant] denied having an interest in guns and telling the officer that he had an infatuation with guns. He also testified that he did not tell Sergeant Uncapher that he fell asleep at 4:00 a.m. with a gun in his pants.

[Appellant] denied telling Sergeant Uncapher that an individual by the name of Jay was present at the apartment. Additionally, [Appellant] testified that he did not tell the

- 8 -

officer that he had purchased marijuana from Jay at the apartment. He also denied ever telling the officer that Jay showed him a gun. He testified that no one in the apartment had a gun that he had asked to see and he never asked anyone to let him hold a gun while he was at the apartment. [Appellant] again testified that he was not in possession of a firearm at the time he went to sleep. [Appellant] disagreed with the officer's testimony regarding what he had told the police about the incident. [Appellant] testified that he was asked general questions by the officer regarding his background, employment, history, and living situation. [Appellant] resided with his grandmother at the time of the incident and he did not live at Sandalwood.

Additionally, the officer allegedly asked [Appellant] if he knew who owned the firearm and [Appellant] replied in the negative. [Appellant] testified that he was not shown the firearm and the officer did not notify him that he was in possession of a firearm. [Appellant] alleged that he did not know which firearm the officer was referring to, but he assumed that the officer was referencing the firearm that [Appellant] observed in the front seat of the police vehicle. [Appellant] testified that he was handcuffed and seated in the back seat of the police vehicle. He was able to observe the firearm, although there was a glass partition separating the front and the back seats. [Appellant] stated that the firearm he observed was the same firearm that was presented in the courtroom during trial. This was allegedly the first time [Appellant] had viewed the firearm. [Appellant] testified that he was not concerned with the firearm because it was not found on his person. He did not question the fact that he was being asked about a firearm and he was not troubled by this because he had "nothing to do with it." [Appellant] did not recall hearing anyone state the terms "gun," "weapon," or "firearm" in the apartment. He also did not remember the officers ever mentioning a firearm while they were in the apartment and when he was awakened from his sleep. [Appellant] testified that he did not see any police officers carrying a gun out of the house with him. Overall, [Appellant] believed that he was innocent of the charges that were filed against him.

Trial Court Opinion, 5/14/18, at 5-14 (internal citations and some internal capitalization omitted).

The jury found Appellant guilty of persons not to possess firearms and firearms not to be carried without a license;[2] on January 23, 2018, the trial court sentenced Appellant to serve an aggregate term of four to ten years in prison.

The trial court denied Appellant's post-sentence motion on May 14, 2018 and Appellant filed a timely notice of appeal.  Appellant raises five claims to this Court:

> 1. Whether the [trial court] erred in determining the jury's verdicts were based on sufficient evidence?
>
> 2. Whether the [trial court] erred [in concluding that] the jury's verdicts were [not] against the weight of the evidence?
>
> 3. Whether the [trial court] erred in denying [Appellant's] suppression motion, finding there was reasonable suspicion to pursue [Appellant] based on an anonymous phone call?
>
> 4. Whether the [trial court] erred in denying [Appellant's] motion in limine to exclude the hearsay testimony of Amber Lovelace, used to prove [Appellant] was located at – and permitted the officers into – the Sandlewood apartment?
>
> 5. Whether the [trial court] erred in overruling [Appellant's] objection to the dismissal of Juror #21, who was excluded on the basis of race in violation of Batson v. Kentucky[, 476 U.S. 79 (1986)]?

Appellant's Brief at 3 (some internal capitalization omitted).

_____

[2] 18 Pa.C.S.A. § 6105(a)(1) and 6106(a)(1), respectively.

We have reviewed the briefs of the parties, the relevant law, the certified record, the notes of testimony, and the opinion of the able trial court judge, the Honorable Meagan Bilik-DeFazio. We conclude that Appellant is not entitled to relief in this case and that Judge Bilik-DeFazio's May 14, 2018 opinion meticulously and accurately disposes of Appellant's issues on appeal. Therefore, we affirm on the basis of Judge Bilik-DeFazio's thorough opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Bilik-DeFazio's May 14, 2018 opinion.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/28/2018

## IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
v. )     No. 3058 C 2015
)
ORLANDO DEAN STANFORD, )

### OPINION AND ORDER OF COURT

The above-captioned case is before this Court for disposition of Defendant's Post-Sentence Motions filed pursuant to Pennsylvania Rules of Criminal Procedure 720(B). Defendant presented the following claims in his Post-Sentence Motions:

    a. The jury's verdict was not based on sufficient evidence given the evidence presented at trial;
    b. The jury's verdict was against the weight of the evidence presented at trial;
    c. The Court of Common Pleas erred in denying Defendant's *pro se* Suppression Motion as the arresting officers lacked the requisite probable cause to pursue the Defendant based on an anonymous tip;
    d. The Court of Common Pleas erred in denying the Defendant's Motion *in Limine* regarding the testimony of Amber Lovelace, whose hearsay testimony was presented to the jury during trial;
    e. The Court of Common Pleas erred in overruling the Defendant's objection to the Commonwealth's use of a peremptory strike on Juror #21, who was excluded on the basis of race in violation of Batson v. Kentucky, 476 U.S. 79 (1986).

Defendant's Post-Sentence Motions, March 6, 2018, at 2.

### FACTS

Defendant was charged with the following crimes in December of 2014:

    Count 1: Person Not to Possess use ETC Firearm, in violation of 18 Pa. C.S.A. 6105(c)(2);
    Count 2: Firearms Not to be Carried without a License, in violation of 18 Pa. C.S.A. 6106(a)(1).

1

An Omnibus Pre-Trial motion Hearing occurred before the Honorable Richard E. McCormick, Jr., on October 24, 2016. Omnibus Pre-Trial Motion Hearing, October 24, 2016.[1] Defendant's Omnibus Pre-Trial Motions consisted of a Motion to Dismiss Pursuant to Rule 600, Motion for Discovery, Motion to Suppress Evidence and Out-of-Court Statements, and Motion *in Limine*. Omnibus Pretrial Motions, August 29, 2016, at 2, 4, 6, 11. At the hearing, the Commonwealth presented the testimony of Sergeant Daniel Uncapher. N.H. at 4. Judge McCormick denied Defendant's Motion to Dismiss Pursuant to Rule 600 and his Motion to Quash, which was filed after Defendant's Omnibus Pre-Trial Motions on October 12, 2016. N.H. at 40. Discovery was previously provided to Defendant, and his Motion *in Limine* was held for trial. N.H. at 45-46. Regarding Defendant's Motion to Suppress, Judge McCormick found that Defendant's statements to Sergeant Uncapher were voluntary under the circumstances and his Motion to Suppress those statements was denied. N.H. at 40-43. Additionally, Judge McCormick indicated the following in reference to statements made by an anonymous caller:

> THE COURT: The only thing that [Officer Uncapher] determined by that is that they believe that you had a warrant against you. Through the independent sources, he determined that there was a warrant, a lawful, outstanding warrant, and he proceeded on that.
>
> So that motion is denied. Your motion to suppress is denied.
>
> ...
>
> The anonymous call led him to further his investigation. That's all that he can do.
>
> ...
>
> It was a call to 911 that caused them to determine that there was, in fact, an arrest warrant out there that had been issued by the Board of Probation and Parole. They had independent information that, in fact, it was a lawful warrant.

---

[1] To decrease the length of each citation, the notes of testimony at the hearing will hereafter be referred to as "N.H." The Omnibus Pre-Trial Motion Hearing in this matter occurred on October 24, 2016.

N.H. at 44-45, 47. Judge McCormick ultimately denied Defendant's Motion to Suppress the statements made by the anonymous caller. N.T. at 43-45.

Defendant's *pro se* Motion *in Limine* was denied by this Court on September 29, 2017, since his Motion was untimely and he was represented by counsel. A jury trial occurred on Defendant's case from October 2, 2017 to October 3, 2017. Jury Trial Proceedings, October 2-3, 2017.[2] Prior to the commencement of trial, both parties met in chambers to discuss preliminary matters with the Court. N.T. at 3. Attorney James Robinson discussed Defendant's *pro se* Motion *in Limine* that was denied. N.T. at 3. He indicated that Defendant was previously told by Judge McCormick in court that he could present his Motion *in Limine* on the date of trial. N.T. at 3. Attorney Robinson stated that he did not have a Motion *in Limine* to file in this case. N.T. at 3. He additionally stated the following:

> [Defendant] appears in his motion *in Limine* to be raising the issue of hearsay, that there's testimonial hearsay that is going to come in that is inadmissible. I went through this file and I am of the conclusion that the hearsay that I think he's speaking of is an Amber Lovelace who consented to allow the police into her residence. I know that during jury trials that the jury is allowed to hear certain background information in a case, and I think if the officer takes the stand and testifies that upon going to the apartment that Miss Lovelace is the tenant, allowed entry, that's fine. If I'm wrong, somebody can tell me. But I think that's background information. Otherwise, I would object. But I don't want to make meritless objections during the trial.

N.T. at 3-4. Initially, this Court was mistaken as to the date of filing of Defendant's Motion *in Limine* for trial. N.T. at 4-6. Nevertheless, this Court stated:

> So the motion we're talking about is a combination of an omnibus pretrial motion and a motion *in Limine*. The reason behind denying the motion *in Limine* is because Mr. Stanford had counsel. I believe it's Mr. Robinson that should make any appropriate motions *in Limine*. I wasn't denying it substantively. I wanted to leave counsel with any motions *in Limine*.
>
> And further, if he's raising this issue as to hearsay and this background as to why or how the police got into the apartment that day, I think that would be not offered for the truth of the matter, other than just to say why the police were there.

---

[2] To decrease the length of each citation, the notes of testimony at trial will hereafter be referred to as "N.T." The Jury Trial Proceedings in this matter occurred from October 2, 2017 to October 3, 2017.

3

N.T. at 5. Attorney Robinson then responded:

> Right. And I think the other issue he would raise is that he would claim that the anonymous tip which was called in is inadmissible hearsay. My experience has been that if that's just being offered for background information, that such testimony is permitted. Had he been charged with other offenses in conjunction with the firearm charges – he's only charged with felon in possession of a firearm and carrying a firearm without a license. Had there been other charges filed along with this case, I probably would have filed a motion for bifurcated trial. But I really have no motions *in Limine*, Judge.

N.T. at 5. This Court ultimately amended its order to deny Defendant's Motion *in Limine* only. N.T. at 6.

Jury selection began on October 2, 2017. During jury selection, each of the jurors were individually interviewed in a separate room regarding their juror questionnaire. Both parties were present during the interview. For purposes of Defendant's Post-Sentence Motions, Juror Number 21 was individually interviewed regarding his juror questionnaire. Jury Selection Proceedings, October 2, 2017, at 2-6. He indicated in his questionnaire that someone close to him was the victim of a crime. Id at 2. Specifically, his mother was involved in a domestic incident which resulted in his presence in court. Id. Juror Number 21 did not feel that there was anything about this incident which caused him to have such strong feelings that he could not be fair in the criminal trial. Id at 2-3. He believed that he could keep the situation completely separate from the criminal trial. Id at 3. Juror Number 21 also indicated in his questionnaire that someone close to him was charged with a crime. Id at 3. Specifically, his sibling was charged with rape and the case proceeded to trial. Id. Juror Number 21 did not participate in those proceedings. Id. His sibling was ultimately incarcerated at the conclusion of the trial. Id. Juror Number 21 maintained that there was nothing about the case, including how it was handled by law enforcement or within the court system, which caused him to have really strong feelings to the point where he could not be fair during trial. Id at 3-4. He felt that he could keep the situation completely separate from the criminal trial. Id at 4. Additionally, Juror Number 21 indicated in his questionnaire that someone close to him was an eyewitness to a crime. Id. His answer pertained to the same domestic incident that he had previously discussed. Id.

Upon the conclusion of Juror Number 21's interview, the Commonwealth exercised a peremptory challenge. Id. Defense Counsel requested that the Commonwealth provide its

4

reasons for the peremptory challenge on the record due to the fact that Juror 21 is African/American. Id at 4-5. The Commonwealth responded with the following:

> Your Honor, I don't believe that the case law supports a requirement that I suggest reasons at this stage because I don't believe one peremptory based upon an African/American person establishes a Batson argument. I would note we permitted another African/American on the jury just a few moments ago.

Id. Defense Counsel was then asked to provide the basis for his request. Id. Defense Counsel stated:

> Well, the basis, Your Honor, is with the defendant being African/American, my client wishes to have a jury of his peers to the fullest extent possible. I just wanted the Commonwealth to clarify its basis for or to establish that there isn't a racially motivated reason for making the strike, Your Honor.

Id. Defense Counsel was unaware of any case law or statutes in support of his request. Id. In response, this Court stated:

> I don't believe that there's any sort of violation, especially in that we already have at least one juror right now who is an African/American. So, I am going to permit this juror to be stricken pursuant to the Commonwealth's peremptory Number 3.

Id at 5-6. The remaining jurors were thereafter selected for Defendant's trial.

Trial commenced following jury selection on October 2, 2017. The Commonwealth first presented the testimony of Sergeant Uncapher. N.T. at 43. At the time of trial, Sergeant Uncapher was employed by the Allegheny Township Police Department. N.T. at 44. He worked for the police department for twenty-four (24) years. N.T. at 44. Sergeant Uncapher worked as a patrolman at the time of the incident in 2014. N.T. at 44. He spent the majority of his time working "on the road" rather than at the station. N.T. at 44. Sergeant Uncapher's duties as a patrolman included accident investigation, general investigation, patrol operations, and answering calls for service. N.T. at 44. In addition, he would assist local police departments upon request. N.T. at 44-45. He also assisted other agencies in the past with the service of arrest warrants. N.T. at 44-45. Sergeant Uncapher testified that, in addition to receiving the written

5

warrant, he can verify the validity of a warrant by contacting Westmoreland County 911. N.T. at 45. Westmoreland County 911 will confirm or deny the warrant by running an NCIC search of the individual's name. N.T. at 45.

On December 21, 2014, Sergeant Uncapher was dispatched by Westmoreland County 911 to the Sandalwood apartment complex (hereinafter "Sandalwood"). N.T. at 46. They received an anonymous tip that Defendant was located at Sandalwood and there was an active warrant for his arrest. N.T. at 46, 61. Sergeant Uncapher was also informed that Defendant was potentially armed with a weapon. N.T. at 46, 61. He confirmed that there was an active warrant for Defendant's arrest through Westmoreland Count 911. N.T. at 46. Westmoreland Count 911 advised Sergeant Uncapher that there was an active warrant for Defendant out of Pennsylvania State Parole. N.T. at 46. He was not aware of Defendant prior to this incident. N.T. at 45-46. He believed that the apartment was rented by Amber Lovelace, but he did not know this information prior to serving the warrant. N.T. at 47. Sergeant Uncapher requested assistance from Officer Hosack in serving the warrant. N.T. at 47. At the time of trial, Officer Hosack was no longer employed by the Allegheny Township Police Department. N.T. at 61.

Sergeant Uncapher testified that he was familiar with Sandalwood as a police officer. N.T. at 47. He described Sandalwood as a row of five (5), two-story apartments with a downstairs living and kitchen area and upstairs bedrooms and a restroom. N.T. at 48. Upon arrival to Sandalwood, Sergeant Uncapher reported directly to the apartment in which Defendant was allegedly present. N.T. at 47. He observed that the front door of the apartment was open and approximately five (5) to ten (10) individuals were located throughout the first floor. N.T. at 48, 62-63. Sergeant Uncapher announced his presence to the individuals and Lovelace immediately approached the door. N.T. at 48. He was not familiar with Lovelace prior to serving the warrant. N.T. at 48. Sergeant Uncapher testified that Lovelace was "very friendly" and she did not object to him being at her home. N.T. at 48. He asked for permission from Lovelace to enter the home. N.T. at 49. She confirmed that Defendant was in the apartment and was located in the upstairs bedroom. N.T. at 49. Sergeant Uncapher did not attempt to speak with the other individuals in the apartment because it was "so loud" and there were "so many people there." N.T. at 63. He maintained that he was not familiar with Defendant prior to this incident and he did not receive anything that would allow him to identify Defendant. N.T. at 49.

6

Officer Hosack subsequently approached Sergeant Uncapher and Lovelace from the back door of the apartment. N.T. at 50. Sergeant Uncapher and Officer Hosack reported to the upstairs bedroom. N.T. at 50. In the bedroom, they observed a male lying on a bed where Defendant was reportedly located. N.T. at 50. The individual was later identified as Defendant. N.T. at 51. Defendant was the only individual located in the bedroom. N.T. at 71. Sergeant Uncapher testified that they shouted for Defendant and announced their presence, but Defendant did not respond. N.T. at 50. Sergeant Uncapher assumed Defendant was sleeping. N.T. at 65. Sergeant Uncapher and Officer Hosack subsequently began handcuffing Defendant and he woke up. N.T. at 51. Sergeant Uncapher explained who they were to Defendant and why they were there. N.T. at 51. He testified that Defendant was dressed in a tank top and a pair of dark colored jeans that day. N.T. at 51.

Sergeant Uncapher searched Defendant and Officer Hosack maintained control of Defendant during the search. N.T. at 51-52. Sergeant Uncapher could not recall if Defendant was sitting or standing during the search. N.T. at 66-67. He testified, however, that an individual is generally standing when he conducts a search. N.T. at 66-67. Defendant did not present any problems during the search. N.T. at 52. Officer Hosack indicated that a weapon was present in Defendant's "crotch area" and officer Hosack retrieved an automatic pistol from this area. N.T. at 52. Sergeant Uncapher subsequently "cleared" the firearm. N.T. at 53. He testified that "clearing" the firearm consists of emptying the firearm's magazine and unchamber of any rounds. N.T. at 53. He did not discover any rounds in the firearm's chamber, but he did recover eight (8) rounds in the firearm's magazine. N.T. at 53. Sergeant Uncapher described the firearm as a nine-millimeter Taurus PT24/7. N.T. at 53. After Sergeant Uncapher cleared the weapon, he returned to his station. N.T. at 54. He entered the firearm into evidence and placed it into an evidence locker. N.T. at 54. The firearm was also submitted to the Crime Lab. N.T. at 57. The bullets were eventually destroyed in accordance with the department's policy against retaining ammunition. N.T. at 71-72.

Sergeant Uncapher contacted Pennsylvania State Parole and advised them that Defendant was in custody. N.T. at 57. Defendant was transported back to the Allegheny Township Police Department and was taken to the processing room and holding cell. N.T. at 58. Sergeant Uncapher testified that Defendant requested to speak with him while he was entering charges and evidence. N.T. at 58. More specifically, Defendant was willing to speak with him if it "helps him

7

out." N.T. at 58. Sergeant Uncapher read Defendant his Miranda rights, which are generally read from a departmental form. N.T. at 59, 72. Defendant indicated that he still wished to speak with Sergeant Uncapher. N.T. at 59. Defendant allegedly told Sergeant Uncapher that he was aware that he was a felon and was not to possess a firearm. N.T. at 59. Defendant also stated that he was at the apartment on the night prior to the incident and was "hanging out" with Lovelace. N.T. at 59. At one point, Defendant supposedly met a male who was known as "Jay." N.T. at 59. Defendant allegedly purchased marijuana from Jay the night before and Jay possessed the firearm that was subsequently found on Defendant. N.T. at 59. Sergeant Uncapher testified that Defendant agreed to hold the weapon for Jay and he fell asleep with it in his pants. N.T. at 60. Sergeant Uncapher was not aware if Jay was present at the apartment on the date of the incident. N.T. at 63-64.

Sergeant Uncapher subsequently prepared a police report of the incident. N.T. at 69. He did not obtain a written statement from Defendant and did not provide a specific reason as to why he did not take a written statement. N.T. at 69-70. He did, however, state that Defendant did not provide much information to him aside from the name "Jay." N.T. at 70. Sergeant Uncapher asked questions to the other residents of Sandalwood regarding Jay, but no one could confirm his identity. N.T. at 70. Additionally, he identified "Cade Kennamuth" as the last registered owner of the firearm found on Defendant. N.T. at 73.

The Commonwealth thereafter presented the testimony of Officer Seth Hosack. N.T. at 73-74. At the time of trial, Officer Hosack was employed by the New Kensington Police Department as a police officer. N.T. at 74. He worked as a police officer for thirteen (13) years. N.T. at 74. On the date of the incident, Officer Hosack was employed by the Allegheny Township Police Department as a patrolman. N.T. at 74. Officer Hosack testified that he received information that a wanted individual was armed at Sandalwood. N.T. at 74-75. Officer Hosack and Sergeant Uncapher reported to Sandalwood. N.T. at 75. Upon their arrival, Sergeant Uncapher traveled to the front and Officer Hosack went to the back of the residence. N.T. at 75. He testified that the back door of the apartment was open. N.T. at 75. At one point, Officer Hosack observed Sergeant Uncapher speaking with Lovelace. N.T. at 75. He testified that Lovelace did not appear to be agitated with their presence and the individuals at the apartment were "very nice." N.T. at 75. Lovelace allegedly indicated that Defendant was upstairs in the bedroom. N.T. at 76.

8

Officer Hosack and Sergeant Uncapher proceeded to the upstairs bedroom of the apartment. N.T. at 76. Officer Hosack testified that an individual appeared to be sleeping in the bedroom. N.T. at 76. This individual was later identified as Defendant. N.T. at 76-77. Officer Hosack holstered his weapon and held his Taser to protect Sergeant Uncapher as he apprehended Defendant. N.T. at 76. Officer Hosack thereafter searched Defendant while he was secured in handcuffs and lying on the bed. N.T. at 76-77. He could not recall the direction in which Defendant was lying. N.T. at 80-81. Officer Hosack testified that he reached near Defendant's "crotch area" and felt what he believed to be a firearm based on its shape, size, and density. N.T. at 76-77. He announced the presence of the weapon while searching Defendant and retrieved a firearm with "some difficulty." N.T. at 76-77. Officer Hosack testified that Defendant was wearing multiple layers of clothing and the firearm was found in the front flap of Defendant's long underwear. N.T. at 77-78, 81. Officer Hosack gave Sergeant Uncapher the weapon while he secured Defendant. N.T. at 78. Sergeant Uncapher "cleared" the weapon. N.T. at 78. They subsequently proceeded to the police station. N.T. at 78. Sergeant Uncapher filed Defendant's charges. N.T. at 78. Officer Hosack was not present for any statements made by Defendant at the police station and he did not participate in the investigation of Defendant's case. N.T. at 78-79, 81. He was also not aware of any fingerprint evidence that may have been recovered from the firearm. N.T. at 81-82.

Sergeant Uncapher was thereafter called again by the Commonwealth to testify. N.T. at 82-84. The Commonwealth requested the opportunity to briefly question Sergeant Uncapher in response to questions asked by Defense Counsel regarding fingerprint or DNA evidence on the firearm. N.T. at 82-84. Sergeant Uncapher was familiar with the availability of fingerprint and DNA testing at the State Police Crime Lab in Greensburg. N.T. at 85. He testified that these tests may be costly depending on the number of tests that are required. N.T. at 85. Sergeant Uncapher does not generally consider this in determining whether to submit items for fingerprint or DNA testing, unless there is a subsequent AFIS hit on a ballistics cartridge. N.T. at 85. He testified that it is not common to submit items that are found on a person's body for fingerprint or DNA testing. N.T. at 85. Sergeant Uncapher was not aware of the exact number that it would have cost to perform testing in the instant case. N.T. at 86. He estimated, however, that the cost to perform testing could have been "in the thousands." N.T. at 86. Sergeant Uncapher testified that, to his

9

knowledge, the firearm that was found on Defendant was never tested for fingerprints. N.T. at 86.

Upon the conclusion of the Commonwealth's case, Defense Counsel moved for a judgment of acquittal with respect to both of Defendant's charges. N.T. at 92. He argued that the case began with an anonymous tip and the testimony of Lovelace and the individual who made the anonymous tip were not presented by the Commonwealth in this case. N.T. at 92-93. Defense Counsel maintained that the Commonwealth provided the testimony of the officers only, who indicated that Defendant had a firearm. N.T. at 92-93. Ultimately, he claimed that the Commonwealth was unable to establish that Defendant had the intent to possess, control, or use or carry a firearm. N.T. at 93. Defense Counsel reiterated that Defendant was sleeping in the bed and allegedly had the firearm on his person. N.T. at 93. He averred that insufficient evidence was presented to establish that Defendant had the requisite intent for these charges to be submitted to the jury. N.T. at 93. Furthermore, he restated that the gun was never processed for prints or DNA evidence. N.T. at 93. Defense Counsel's Motion was noted for the record and denied. N.T. at 93. This Court found that there was sufficient evidence for the charges to be sent to the jury. N.T. at 93.

Defendant additionally testified at trial regarding the incident. N.T. at 95-96. On the date prior to Defendant's arrest, he travelled to Lovelace's apartment at Sandalwood. N.T. at 96-98. He identified Lovelace as his friend. Defendant stated that he knew Lovelace for about a month and Sergeant Uncapher's statement that he knew her for approximately two (2) weeks was incorrect. N.T. at 97, 117. Defendant testified that there were about four (4) to five (5) other individuals present at Lovelace's apartment. N.T. at 97. He was not familiar with all of the individuals. N.T. at 98. He did recall, however, that one of the individuals was named Zach Ferguson. N.T. at 98. At the apartment, they were "smoking, hanging out, laughing, watching videos, [and] movies." N.T. at 98. At around 1:00 or 2:00 a.m., Defendant fell asleep in the upstairs master bedroom of the apartment. N.T. at 97. He did not recall informing Sergeant Uncapher that he fell asleep at approximately 4:00 a.m. and indicated that his statement was incorrect. N.T. at 113. Defendant testified that there were two (2) bedrooms located in the apartment. N.T. at 99. Additionally, no one else was present in the bedroom with Defendant when he went to sleep; however, several other individuals were still present in the apartment at the time he went to sleep and they were mostly downstairs. N.T. at 99.

10

Defendant woke up from sleeping while he was being handcuffed. N.T. at 99-100. He testified that he heard the officer announce his presence and request Defendant's identity. N.T. at 100. Defendant announced his identity to the officer. N.T. at 100. Defendant denied obtaining a firearm from anyone and testified that a firearm was not located on his person at the time he went to sleep. N.T. at 100. Defendant also claimed that he never observed the firearm that he was charged with possessing. N.T. at 100. He testified that he did not know that he had an active warrant out for his arrest due to missing a parole appointment. N.T. at 100-101. Defendant was searched while he was being handcuffed. N.T. at 102. He testified that he was lying on his right shoulder during the search and the officer helped him get out of bed. N.T. at 102. Additionally, he testified that Sergeant Uncapher's statement as to what he was wearing was incorrect and he was not wearing long underwear or jeans when he woke up. N.T. at 102, 115-116. He also stated that he was not wearing gym shorts. N.T. at 115. Rather, Defendant claimed that he was dressed in a white tank top, boxers, and socks at the time he was handcuffed. N.T. at 101-102. He testified that he asked to put on his pants and shoes after he was handcuffed and the officers permitted him to do so. N.T. at 101, 114-115. He also stated that one of the officers assisted him with putting additional clothing on. N.T. at 101, 114. Additionally, Defendant put on long johns. N.T. at 114-115. Defendant also testified that he was searched by the officers after he was permitted to put on his additional clothing. N.T. at 114. He also did not recall seeing anyone else arrested at the apartment. N.T. at 118.

Defendant recalls signing a document entitled "Constitutional Rights" on the date of the incident that was prepared by Sergeant Uncapher. N.T. at 103-104. Defendant testified that he was located in the Allegheny Township Police Department holding cell while signing the document. N.T. at 104. The document informed Defendant of his rights and included a statement providing that the officer read Defendant his rights and Defendant understood what his rights were. N.T. at 104, 111. Additionally, it provided that Defendant was willing to make a statement and answer the questions asked of him. N.T. at 111. It also stated that Defendant did not wish to have a lawyer present. N.T. at 111. The document further indicated that no promises or threats had been made to induce Defendant to make a statement and no pressure or coercion of any kind had been used against him. N.T. at 111. Defendant spoke voluntarily with Sergeant Uncapher after signing the document. N.T. at 105. Defendant testified that Sergeant Uncapher asked him if he was willing to answer a few questions and he agreed. N.T. at 105. Defendant denied initiating

11

the conversation with Sergeant Uncapher and stating that he would like to help himself out if he could. N.T. at 105, 119. He testified that Sergeant Uncapher did not provide him with the option to have his statement written or recorded. N.T. at 119-120.

Defendant testified that Sergeant Uncapher's partner was also present during his questioning. N.T. at 120. Defendant allegedly told Sergeant Uncapher that he was at Sandalwood for one (1) or two (2) days and he knew Lovelace. N.T. at 105. Defendant also informed Sergeant Uncapher that he thought Lovelace was a "good person" and they did not have a romantic relationship. N.T. at 106. Additionally, Defendant told Sergeant Uncapher that he knew Lovelace for about a month. N.T. at 106. He testified that he knew he had a warrant issued by probation and parole due to missing a scheduled appointment with his parole officer. N.T. at 106. He also informed Sergeant Uncapher that he had a few discrepancies with probation and parole regarding working and missing appointments. N.T. at 106-107. Defendant was aware that he was not allowed to possess any firearms. N.T. at 107, 116. Defendant did not question Sergeant Uncapher when he was asked if he knew he was not allowed to possess a firearm. N.T. at 116. Instead, Defendant stated that he was not "worried about it" because he did not have anything to do with the firearm. N.T. at 116. Defendant denied having an interest in guns and telling the officer that he had an infatuation with guns. N.T. at 117-118. He also testified that he did not tell Sergeant Uncapher that he fell asleep at 4:00 a.m. with a gun in his pants. N.T. at 118.

Defendant denied telling Sergeant Uncapher that an individual by the name of Jay was present at the apartment. N.T. at 107. Additionally, Defendant testified that he did not tell the officer that he had purchased marijuana from Jay at the apartment. N.T. at 107-108. He also denied ever telling the officer that Jay showed him a gun. N.T. at 108. He testified that no one in the apartment had a gun that he had asked to see and he never asked anyone to let him hold a gun while he was at the apartment. N.T. at 108. Defendant again testified that he was not in possession of a firearm at the time he went to sleep. N.T. at 108. Defendant disagreed with the officer's testimony regarding what he had told the police about the incident. N.T. at 108. Defendant testified that he was asked general questions by the officer regarding his background, employment, history, and living situation. N.T. at 109. Defendant resided with his grandmother at the time of the incident and he did not live at Sandalwood. N.T. at 109.

Additionally, the officer allegedly asked Defendant if he knew who owned the firearm and Defendant replied in the negative. N.T. at 109. Defendant testified that he was not shown the

12

firearm and the officer did not notify him that he was in possession of a firearm. N.T. at 109. Defendant alleged that he did not know which firearm the officer was referring to, but he assumed that the officer was referencing the firearm that Defendant observed in the front seat of the police vehicle. N.T. at 109. Defendant testified that he was handcuffed and seated in the back seat of the police vehicle. N.T. at 109-110. He was able to observe the firearm, although there was a glass partition separating the front and the back seats. N.T. at 112-113. Defendant stated that the firearm he observed was the same firearm that was presented in the courtroom during trial. N.T. at 110. This was allegedly the first time Defendant had viewed the firearm. N.T. at 112. Defendant testified that he was not concerned with the firearm because it was not found on his person. N.T. at 109, 112. He did not question the fact that he was being asked about a firearm and he was not troubled by this because he had "nothing to do with it." N.T. at 116. Defendant did not recall hearing anyone state the terms "gun," "weapon," or "firearm" in the apartment. N.T. at 112. He also did not remember the officers ever mentioning a firearm while they were in the apartment and when he was awakened from his sleep. N.T. at 112. Defendant testified that he did not see any police officers carrying a gun out of the house with him. N.T. at 112. Overall, Defendant believed that he was innocent of the charges that were filed against him. N.T. at 110.

Defendant was ultimately found guilty of both charges by the jury. Sentencing was deferred and a Pre-Sentence Investigation was ordered. Sentencing occurred before this Court on January 23, 2018. At Count 1, Defendant was sentenced to four (4) to ten (10) years of incarceration. He was given credit for time served from September 19, 2017 to September 20, 2017, and from October 3, 2017 and up to the date of sentencing. Defendant was ordered to undergo a mental health evaluation, follow recommended treatment, and pay costs. The contraband/firearm was to be seized, forfeited, and destroyed by the Pennsylvania State Police. Defendant's Motion for Extraordinary Relief was denied. At Count 2, Defendant was sentenced to three (3) to seven (7) years of state incarceration concurrent to Count 1. Defendant was ordered not to possess any firearms. Defense Counsel's Motion to Withdraw as Counsel was granted and Attorney Kenneth Noga was appointed as counsel for the purposes of Defendant's appeal. Defendant submitted a *pro se* Motion for Post-Sentence Relief on January 23, 2018. Defense Counsel was granted twenty (20) days to submit Amended Post-Sentence Motions to the Court. Defense Counsel's subsequent request for an extension of time to file Amended Post-Sentence Motions was granted. Defendant filed Amended Post-Sentence Motions on March 6,

13

2018. Defendant was ordered to submit a brief in support of his Post-Sentence Motions within thirty (30) days. The Commonwealth was ordered to file a brief in response within thirty (30) days upon receipt of Defendant's brief. Defendant filed a Brief in Support of Post-Sentence Motions on April 3, 2018. The Commonwealth's subsequent Motion for Continuance of Time to File a Brief in Opposition to Defendants Post Sentence Motions was granted. The Commonwealth filed a Brief in Opposition to Defendant's Post-Sentence Motions on May 8, 2018.

## STIPULATION

The parties stipulated to the following facts during trial:

> The parties stipulate that Corporal Robert Hagins of the Pennsylvania State Police Crime Lab is an expert in the field of firearms operability and identification. Corporal Hagins would have testified that he received the Taurus PT24 nine-millimeter handgun, TBS 61511, and magazine which were admitted as Commonwealth's Exhibit Number 1. Corporal Hagins would further testify that he test fired the firearm using factory nine-millimeter ammunition and found it to function as designed. Further, the parties stipulate that if called, Agent Martin Vojacek, of the Pennsylvania Board of Probation and Parole would testify that, at the time of this incident, the defendant had previously been convicted of a felony violation of the Controlled Substance, Drug, Device, and Cosmetic Act. Further, Agent Vojacek would testify that the Board of Probation and parole had issued a warrant for the arrest of Mr. Stanford which was valid and active on December 21, 2014. And further, the parties stipulate that the defendant did not possess a valid lawfully issued license to carry a firearm on December 21, 2014.

N.T. at 88.

## DISCUSSION

### I.    Sufficiency of the Evidence

Defendant claims that the verdict at all counts was not supported by sufficient evidence. Def.'s Br. p.6. In Commonwealth v. Brown, the Pennsylvania Superior Court stated:

14

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Commonwealth v. Brown, 23 A.3d 544, 559-560 (Pa. Super. Ct. 2011) (*en banc*) citing Commonwealth v. Hutchinson, 947 A.2d 800, 805-06 (Pa. Super. Ct. 2008), appeal denied, 602 Pa. 663, 980 A.2d 606 (2009) (quoting Commonwealth v. Andrulewicz, 911 A.2d 162, 165 (Pa. Super. Ct. 2006)).

Defendant argues that there was insufficient evidence for the jury to find him guilty at both counts. At Count 1, Defendant was found guilty under the following statute:

(a) **Offense defined.—**

(1) A person who has been convicted of an offense enumerate in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer, or manufacture or obtain a license to possess, use, control, sell, transfer, or manufacture a firearm in this Commonwealth.

...

(c) Other persons.—In addition to any person who has been convicted of any offense listed under subsection (b), the following persons shall be subject to the prohibition of subsection (a);

...

(2) A person who has been convicted of an offense under the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, or any equivalent Federal statute or equivalent statute of any other state, that may be punishable by a term of imprisonment exceeding two years.

15

18 Pa. C.S.A. § 6105(a), (c)(2). At Count 2, Defendant was found guilty under the following statute:

**(a) Offense defined.—**

(1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa. C.S.A. § 6106(a)(1).

This Court finds that the jury was presented with sufficient evidence during trial that could lead them to believe that Defendant was guilty of both charges. The Commonwealth introduced the firearm that was allegedly found on Defendant and its magazine as Commonwealth's Exhibit Number 1. N.T. at 54, 88. The parties stipulated to several facts that were read to the jury. N.T. at 88. Specifically, the parties stipulated to the testimony of Corporal Robert Hagins, who would have testified as to the characteristics of the firearm that was found on Defendant. N.T. at 88. Additionally, the parties stipulated to the testimony of Agent Martin Vojacek, who would have testified that Defendant had previously been convicted of a felony violation of the Controlled Substance, Drug, Device, and Cosmetic Act. N.T. at 88. The parties also stipulated that the Board of Probation and Parole had issued a warrant for Defendant's arrest that was active on December 21, 2014, and Defendant did not possess a valid lawfully issued license to carry a firearm on that date. N.T. at 88.

The Commonwealth presented the testimony of Sergeant Uncapher and Officer Hosack. Sergeant Uncapher stated that there was a warrant for Defendant's arrest from Pennsylvania State Parole. N.T. at 46. Sergeant Uncapher and Officer Hosack testified that they reported to Sandalwood and found Defendant sleeping in the upstairs bedroom in Lovelace's apartment. N.T. at 47-48, 50-51, 76-77. They both testified that Defendant was handcuffed and searched. N.T. at 51-52, 76-77. Officer Hosack allegedly indicated that a weapon was present in Defendant's "crotch area" and he retrieved an automatic pistol from the front flap of the long underwear that Defendant was wearing. N.T. at 52, 76-77, 81. Sergeant Uncapher testified that Defendant indicated he was willing to speak with him if it would "help him out." N.T. at 58. Defendant allegedly informed Sergeant Uncapher that he knew he was a felon and was not to

16

possess a firearm. N.T. at 59. Defendant also allegedly stated that Jay possessed the firearm that was found on him the night before and Defendant agreed to "hold" the weapon for Jay. N.T. at 59-60. Defendant allegedly told Sergeant Uncapher that he fell asleep with the weapon in his pants. N.T. at 60. Sergeant Uncapher additionally provided reasons as to why fingerprint or DNA evidence was not taken from the firearm. N.T. at 82-86.

Defendant disagreed with the majority of the testimony presented by the Commonwealth and Defendant testified that he is innocent of the charges that were filed against him. N.T. at 110. The jury heard conflicting testimony as to what Defendant was wearing on the date of the incident. N.T. at 51, 77-78, 101-102, 115-116. Additionally, Defendant denied making the alleged statements to Sergeant Uncapher. N.T. at 105-109, 118. Defendant testified that he did not initiate a conversation with Sergeant Uncapher while he was in the Allegheny Township Police Department holding cell. N.T. at 104-105, 119. Defendant claimed that a firearm was not located on his person at the time he went to sleep and he never observed the firearm that he was charged with possessing until after he was in custody in the police vehicle. N.T. at 100, 109, 112, 117-118. The jury, however, was free to believe all or none of Defendant's testimony.

Defendant also argues that the Commonwealth failed to introduce any substantive verification of the testimony presented and produced no physical evidence. Def.'s Br. at 5-6. Specifically, Defendant argues that the Commonwealth failed to produce any recording or transcripts of the anonymous call to 911 dispatchers and the Commonwealth failed to call Lovelace to verify her alleged statements. Def.'s Br. at 5. This Court agrees with the Commonwealth that this evidence has "no bearing on the question of whether the Commonwealth submitted sufficient evidence to the jury." Commw.'s Br. at 2. Additionally, Defendant argues that the testimony of the officers during trial contradicts earlier statements made by Sergeant Uncapher that he, rather than Officer Hosack, searched Defendant. Def.'s Br. at 2 n.1, 6. This fact, however, is not dispositive.

Viewing all of the evidence in a light most favorable to the Commonwealth, as the verdict winner, this Court finds that there was sufficient evidence to enable the jury to find each element of the crimes charged. The jury was free to consider and believe all or none of the evidence presented to it and this Court finds no error in the jury's determination.

### a. Weight of the Evidence

Defendant also argues that the verdict was against the weight of the evidence. Def.'s Post-Sentence Motions, at 3. "A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." Commonwealth v. Lewis, 911 A.2d 558, 566 (Pa. Super. Ct. 2006) (quoting Commonwealth v. Hunzer, 868 A.2d 498, 507 (Pa. Super. Ct. 2005), appeal denied, 880 A.2d 1237 (Pa. 2005)). As stated in several cases for legal precedent, the weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. Id. at 565. Furthermore, a new trial should only be awarded when the "verdict is so contrary to the evidence as to shock one's sense of justice." Commonwealth v. Miller, 724 A.2d 895, 901 (Pa. 1999). For the aforementioned reasons, this Court finds that the verdict was not against the weight of the evidence. The verdict is not so contrary to the evidence as to "shock one's sense of justice."

### II.  Motion to Suppress

Defendant argues that the Court of Common Pleas erred in denying the Defendant's *pro se* Motion to Suppress. Def.'s Post-Sentence Motions, at 3. Specifically, Defendant argues that "the arresting officers lacked the requisite probable cause to pursue the Defendant based on an anonymous tip." Def.'s Post-Sentence Motions, at 3. This Court agrees that anonymous tips are generally unreliable and anonymous calls alone are not sufficient to establish reasonable suspicion of criminal activity. Commonwealth v. Goodwin, 750 A.2d 795, 798 (Pa. 2000); Def.'s Br. at 7. However, in the case *sub judice*, Sergeant Uncapher relied on more than just the anonymous tip when proceeding to Sandalwood. After learning of the anonymous tip, Sergeant Uncapher had Westmoreland County 911 run Defendant's name and Westmoreland County confirmed that there was an active warrant for Defendant's arrest out of Pennsylvania State Parole. N.T. at 46. Sergeant Uncapher thereafter proceeded to Sandalwood based on this information. N.T. at 46-47. This Court agrees with the reasoning of the Suppression Court. The anonymous call merely led Sergeant Uncapher to further his investigation. N.H. at 43-45, 47. Additionally, this Court agrees that the anonymous tip did not give rise to an unlawful entry into the apartment and an unwarranted search of Defendant. Commw.'s Br. at 4. Rather, Sergeant

18

Uncapher and Officer Hosack obtained voluntary consent from Lovelace to enter the apartment and Lovelace notified them that Defendant was upstairs. N.T. at 49. Defendant's Motion to Suppress was properly denied.

## III.   Motion *in Limine*

Defendant argues that the Court of Common Pleas erred in denying Defendant's *pro se* Motion *in Limine* "regarding the testimony of Amber Lovelace, whose hearsay testimony was presented to the jury during trial." Def.'s Post-Sentence Motions, at 3. Hearsay is inadmissible, except under certain circumstances. Pa. R. E. 802. The Pennsylvania Rules of Evidence provide the following in pertinent part:

> (c) Hearsay. "Hearsay" means a statement that:
>
> > (1) the declarant does not make while testifying at the current trial or hearing; and
> > (2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Pa. R. E. 801(c). This Court recognizes Judge McCormick's statement at Defendant's Omnibus Pretrial Motions Hearing on October 24, 2016, that Defendant's *pro se* Motion *in Limine* was to be "dealt with at the time of trial to determine whether there are or there aren't any hearsay that are applicable at the time of trial." N.H. at 45. However, Defendant was not represented by counsel at the time he filed his Motion *in Limine*. Defendant was later appointed counsel by this Court. Defendant's *pro se* Motion *in Limine* was primarily denied because he was represented by Attorney Robinson at the time of trial. N.T. at 5. This Court wanted to leave counsel with any Motions *in Limine*. N.T. at 5. Attorney Robinson did not wish to make any Motions *in Limine* and he believed that Defendant's *pro se* Motion *in Limine* was without merit. N.T. at 3-5.

Additionally, this Court finds that Defendant's Motion *in Limine* regarding the statements of Lovelace that were presented during trial is without merit. The statements are not hearsay because they were not offered for the truth of the matter asserted therein. N.T. at 5. Sergeant Uncapher testified that Lovelace gave him permission to enter the home and she indicated that Defendant was present in the upstairs bedroom of the apartment. N.T. at 49. Officer Hosack confirmed that Lovelace made these statements. N.T. at 76. An out of court statement offered to explain the witness's course of conduct is not hearsay. Commonwealth v. Rega, 933 A.2d 997,

19

1017 (Pa. 2007); Def.'s Br. at 9. Lovelace's statements were not used to prove that Defendant was located in the upstairs bedroom. Rather, they were used to show Sergeant Uncapher and Officer Hosack's actions and the reasons for their actions; therefore, they were not offered for the truth of the matter asserted therein and they are not considered hearsay.

## IV. Peremptory Strike of Juror

Finally, Defendant argues that "the Court of Common Pleas erred in overruling the Defendant's objection to the Commonwealth's use of a peremptory strike on Juror Number 21, who was excluded on the basis of race in violation of Batson v. Kentucky, 476 U.S. 79 (1986)." Def.'s Post-Sentence Motions, at 3. A defendant has the burden to establish a prima facie case of purposeful discrimination based solely on evidence concerning the prosecutor's exercise of peremptory challenges at trial. Batson, 476 U.S. at 96. In order to establish a prima facie case, the defendant must first show that he is a member of a cognizable racial group and the prosecutor has exercised peremptory challenges to remove members of the defendant's race from the venire. Id. The defendant may rely on the fact that "peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate." Id. Finally, the defendant must show that these facts raise an inference that the prosecutor used that practice to exclude the veniremen based on their race. Id. A trial court should consider all relevant circumstances in determining whether Defendant has established a prima facie case of purposeful discrimination. Id. Once Defendant has established a prima facie case of purposeful discrimination, the burden then shifts to the Commonwealth to provide a neutral explanation for challenging the black jurors. Id at 97. The prosecutor's explanation does not need to rise to the level that would justify the exercise of a challenge for cause. Id. Additionally, the prosecutor may not rebut the defendant's prima facie case by stating that he challenged jurors based on his intuitive judgment that they would be partial to the defendant due to their shared race. Id. The prosecutor also may not rebut the defendant's prima facie case by denying that he had a discriminatory motive or affirming his good faith in making selections. Id at 98. The trial court then must determine if the defendant has established purposeful discrimination. Id.

In view of all of the relevant circumstances, this Court finds that Defendant failed to establish a prima facie case of purposeful discrimination based on the Commonwealth's use of a peremptory strike on Juror Number 21 during trial. Defendant is black and the Commonwealth

20

exercised a peremptory challenge of Juror Number 21, who is of the same racial group as Defendant. Def.'s Br. at 11; Jury Selection Proceedings, October 2, 2017, at 4-5. Defendant, however, has failed to show that these facts raise an inference that the prosecutor engaged in a practice to exclude veniremen based on race. As this Court stated during jury selection, a juror of the same racial group as Defendant was already selected to serve on the jury at the time of the Commonwealth's peremptory strike of Juror Number 21. An additional juror, who was of the same racial group as Defendant, was also selected to serve on the jury during trial. Overall, two (2) out of three (3) black jurors who were questioned during *voir dire* were selected to serve on the jury.

Defendant argues that Juror Number 21's answers during jury selection do not provide a basis for exclusion and that the Commonwealth failed to offer an explanation for its peremptory strike of Juror Number 21. Def.'s Br. at 11. Juror Number 21 affirmatively answered multiple questions in his juror questionnaire. Jury Selection Proceedings, at 2-4. Although Juror Number 21 provided an explanation for each of his answers and he indicated multiple times that he could remain impartial during trial, the prosecutor was not precluded from utilizing one of his peremptory strikes. This factor is essentially of no consequence in determining whether Defendant established a prima facie case of purposeful discrimination based on the Commonwealth's peremptory strike. Additionally, assuming *arguendo* that the burden had shifted to the Commonwealth to provide a neutral explanation for challenging Juror Number 21, the Commonwealth's explanation does not need to rise to the level that would justify a challenge for cause. Batson, 476 U.S. at 97. As the Commonwealth indicated in its brief, "a party would never have a need to "waste" a peremptory challenge on a potential juror who demonstrates they could not be fair." Commw.'s Br. at 8. Upon consideration of the circumstances surrounding the exclusion of Juror Number 21, this Court determined that there was no need for the Commonwealth to provide an explanation on the record for its peremptory challenge. Jury Selection Proceedings, at 5-6. Ultimately, Defendant failed to establish a prima facie case of purposeful discrimination and Juror Number 21 was properly stricken in accordance with the Commonwealth's peremptory challenge.

Based on the foregoing, this Court hereby issues the following order:

21